Just wait a few minutes, people are coming in and out. Good morning, Your Honors. My name is Renee Pietropalo and I represent the appellant, Savannah Holyfield. With the court's permission, I'd like to request five minutes for rebuttal. Yes, that's granted. I think the simplest way to decide this case is to first determine when Mr. Holyfield was seized because if the officers lacked reasonable suspicion at the moment of seizure, this court doesn't need to determine whether the show of force by the takedown team turned the seizure into a de facto arrest. It's black letter law. It goes without saying that the Fourth Amendment seizure takes place when an officer has in some way restrained the liberty of a citizen either by means of physical force or show of authority. Here we're talking about a show of authority and the test is objective. Whether the officer's words and actions would have conveyed to a reasonable person who was being ordered to restrict his movement. Here we have Mr. Holyfield seated as a passenger in a car that's hood is up at a gas station. The takedown team converges. Let me back up. What do we know about Ms. Harris and Mr. Holyfield? We know nothing about Mr. Holyfield. He's an unknown quantity. And we know that Ms. Harris is a black woman seated in the car. She's a known drug dealer. No. We know that she has a drug history. That's the only thing that the officer said. And we know that he'd arrested her in the past two or possibly three times. And we don't know for what. She could have had an addiction to prescription painkillers and had retail theft arrests in her past. So we don't know. So that's all we have. We have a statement in the record that she had a drug history and the one officer who was the primary person at the surveillance had personally arrested her three times. But we don't know. Do we know whether they were drug related? No, we do not know. And we know there was a tip, anonymous tip. We can't consider the tip in any way, shape, or form because the government. Why can't we consider the fact that the police had a tip and that was the reason they were surveilling this particular area? Because the government at the suppression hearing, there was a motion to, I think, discover the identity of the confidential informant. And rather than go through that and determine the credibility and reliability of the CI, the government chose to back out all of the information that they had from the CI. I think Judge Hardman made a strong statement that he did, and he, in fact, struck from the record all reference to the CI. Which, to me, is very curious. Yes, I think there's quite a difference between striking the reference to the confidential informant and ignoring the fact that the police had a tip that a drug transaction was going to take place. But how can we know what the tip said? We don't have to know that. That gives the police a reason to have a reasonable suspicion, does it not, that something's going on. And this anonymous tip that something's going on is corroborated by what they see at the gas station. Well, I disagree because, first, the tip is struck. No, no, no. The tip was not struck. The information in the tip was struck. But wouldn't the information in the tip include that a drug transaction is going to occur? Why do you think that the police were there with their drug team? We know it's because of the tip, but we can't consider the contents of that tip. No, I'm not talking about what the tip might have been. The tip might have been that said Ms. Harris is going to be there to go on a drug transaction or something like that. The government dropped that out of the case, but nevertheless the fact is they had a tip, and in response to the tip they showed up in the area and then made their observation. The police just didn't happen to be there. No, they didn't just happen to be there. But again, I think we need to get back to the point of seizure. And the United States Supreme Court in Mendenhall tells us that a reasonable person would not have felt free to leave when confronted with the threatening presence of several officers or the display of a weapon by an officer or the use or tone of voice by an officer indicating compliance with the officer's request might be compelled. And in this case we have all three things. All right, what happened? Play it out as exactly what happened when. We have Mr. Harris, Mr. Covey, I'm sorry, Mr. Holyfield seated in the passenger seat of the car. We have the takedown team being told to move in. So three cars... Well, you're missing something. He comes in with another person. The person enters the mini-mart. He gets out, he walks across to the car that is sitting beside the mini-mart, and he has bulges in his jacket. Yes, I think we've moved on then to whether or not there's reasonable suspicion from the point of seizure. And yes, I agree with all of that. All right, we'll map it a little more. So he gets in the car. We have a woman seated in a car for 30 to 40 minutes at a gas station at the air pump with her hood up making two cell phone calls. We have Mr. Holyfield pull up to the convenience store. The driver, no, the passenger of the car goes into the convenience store. Mr. Holyfield gets out of the car. Yes, has two large bulges in his shorts pockets. Walks to Ms. Harris' car, gets in the car. They chat for a minute. He uses his left hand to pull a bag out of his left pocket, and that's it. That's what we have at the moment of seizure. That cannot be enough for reasonable suspicion. Now, you're assuming seizure. All right, what happened that constituted seizure? Seizure is three police cars, two marked, one unmarked, converging on the scene within 10 seconds of being called so we know that they're going quickly. One of the cars pulls right up to Ms. Harris' driver's side. Three of the officers from that car immediately get out of the car. One officer runs to the car with his gun drawn. One officer runs to the car yelling, Pittsburgh police. That's the moment of seizure because under the case law, under Mendenhall, we have a reasonable person would have felt that his liberty was restrained when he's confronted by that show, of course, including a weapon being drawn. That has to be the moment of seizure. And at that moment, do the officers have reasonable suspicion? And I think what's critical to note in this case is what's missing. We don't have any evidence that this is a high-crime area. This is a daytime. This is July early afternoon at a public place, a convenience store and gas station. This isn't a remote location at 2 o'clock in the morning, again, in a high-crime area that we know has tons of drug trafficking activity going on. There's no exchange. I don't think that we can get past the fact that there's no exchange. The bag is taken out of his pocket. Nobody saw him hand the bag to Ms. Harris. Nobody saw an exchange of currency. Nobody saw the lacidine bag. He threw the bag in the back seat, did he not? He threw the bag in the back seat, but for the throwing of the bag to play any role in the reasonable suspicion analysis, he would have had to have thrown the bag before the moment of seizure. Now, because if the throwing occurs after the seizure, we know it's part of the unlawful search and it's fruits and has to be suppressed. The government below argued to the district court that Holly filled through the bag before the officers got out of the car and therefore pre-seizure, but the district court explicitly found at footnote 2 of its opinion that the record was ambiguous as to the timing of the throw. He says, this is at appendix page 4, footnote 2, although the government contends the officers had not left their vehicle when Holly filled through the bag into the back seat. The record is ambiguous on this point, and later the court says, Holly filled may have thrown the baggie in response to the approach of the officers, one of whom had his gun drawn. The government bears the burden at the suppression hearing of proving that an exception to the warrant requirement exists. Well, Covington testified that he threw it  was he saw him take it out of his car. Exactly. This court is not a fact-finding court. For this court to accept that the throwing occurred pre-seizure, pre-officers getting out of the car and approaching with the weapons drawn, this court would be the only court making that finding. The district court explicitly found that the record was ambiguous, and that's why the throwing cannot be part of the reasonable suspicion analysis. How about the concept that had they walked up to the car and not made this show of force, there would have been an inevitable discovery of the drugs, and therefore the show of force really didn't matter and should be taken into account. If they had reasonable suspicion to walk up to the car, they would have been... Well, I mean, you don't need a reasonable suspicion to walk up to a car. Do you? A police officer? You don't need reasonable suspicion to walk up to a car and say, how are you doing? Certainly not for a consensual encounter for an officer to approach a citizen on the street, but that is so not what happened in this case. We have so much more than that. The three police cars, the seven officers, the one officer with the gun drawn, the other officer shouting, Pittsburgh police, and we have so much missing from the record in this case, they had no prior dealing with Mr. Holyfield. They didn't know him from Adam. They knew Ms. Harris, but only... So your theory is he could just as easily have been bringing lunch to a woman broken down in a car. He could have been bringing her a spark plug in the back to fix the car that had its hood open for 30 to 40 minutes.  We'll hear from you on rebuttal. Thank you. May it please the court, Laura Irwin from the U.S. Attorney's Office on behalf of the government. This court should affirm the district court's decision to deny Mr. Holyfield's suppression motion. As this court knows, the test is reasonableness, and in this case, there was a reasonable tarry stop, and here's why. You have to go through it and find out what happened at each juncture. This is what happened. Detective Covington is sitting in the parking lot. He sees Ms. Harris for approximately 45 minutes in a car with the hood up, making a couple cell phone calls. He knows that she has some sort of a drug history. Her window, her driver's side window is down. She's doing nothing to affect any type of repair or anything to her car. After approximately 45 minutes, Mr. Holyfield arrives with the passenger in his car. He gets out. Detective Covington sees him with two bulges, one in each pant pocket. He approaches Harris' car, doesn't look at the engine or anything under the hood, doesn't talk with her. He gets in the car. After a few minutes or a moment, he pulls out this bag. Detective Covington thinks, I suspect that this is drugs. How reasonable is that? What is it? We have to have an articulable suspicion. Is it not? I mean, tell me how that is not acting on a hunch as compared to an articulable suspicion. It's not a hunch because he knows that Ms. Harris has a drug history. He's suspicious that she's been sitting there doing nothing about her car in the middle of the day in July with only the driver's window partially down. He's suspicious because Holyfield walks over, doesn't look at the car, doesn't talk to her, gets in after having bulges in each pocket. And if that's not enough, we have the events that happen after that. You have a tip, too, don't you? We do have a tip, Your Honor. I can't understand why the government did not produce evidence of what happened in the tip. I'm actually not privy to that decision. I do know that it was made. I don't know whether they perceived a J.L. problem or what it was. But the government did ask Mr. Holyfield, without any objection from defense counsel, basically the point you made, why were you there? We had a tip. Nothing else is asked. Well, and without the reasonableness, without an inquiry into the reasonableness of the tip or the content of the tip, I mean, the content could have been, you know, I heard from someone four weeks ago at a party that this woman does drugs. And we don't know who the tipster is. The tipster could be a four-time lying criminal. I mean, without knowing any background, we can't consider the tip as providing any kind of suspicion here, can we? I would agree with you, Your Honor. It explains why the police were there, aren't they? All these officers were gathered at one point. That's highly unusual, particularly when the members are the narcotics squad. I would agree with you. The tip is the elephant in the room. Right, but there was a stipulation, and there's nothing in the district court's opinion to indicate that he relied in any way on the tip to find a reasonable suspicion. No, no, no, no. I think the stipulation was that you'll not rely on the information in the tip. That's different from having a tip. I agree with you, but keep in mind that the defendant has never raised that as being an issue before this court, that it in any way changes the reasonable suspicion analysis. Well, and you haven't argued that the tip... That's correct. ...offers any kind of support. That's correct. So we have these four pieces of information that Detective Covington knows. Why is it that we couldn't just as easily, or that one could not just as easily have assumed that she was broken down in the car and he was bringing lunch or something else? I mean, we just have very few facts here about anything and what was going on. As the court knows, innocent activity taken piece by piece may not be enough, but the officers are allowed to use their experience as narcotics officers and put these facts together. Someone with a drug history, sitting in a car in July, doing nothing about it. But the concept is reasonable, of course. And whereas this may have been enough for someone to go up and ask a few questions preliminarily, what are you doing here, let me see your license, etc., etc., to then come in and to say that this is... I mean, that's reasonable suspicion, to be stopped and asked for ID. The kind of government activity that went on here requires probable cause, does it not? No, I still think we're with reasonable suspicion. If you'll let me continue with the timeline, I can show you what happened next. All right, but what happened next isn't relevant if we, in the timeline, find that the force occurred, i.e., the cars and the gun approach, when the only things that happened were sitting in the car, pulling out the plastic bag. Boom. That's if you assume that the cars arrived, the officers got out, and the gun was drawn all at the same point in time. There's no finding or any evidence at any place to indicate when the gun was drawn. Well, Covington said he approached with the gun drawn, and first he radioed others to come. He approached with the gun drawn, and when Harris sees the officers coming, he tosses the bag in the back. That's what Covington testified. Right, so I agree with you, but you have to remember that there's other officers there. There's only two officers that get out of their cars. The defense would have you believe that all seven officers got out. The record only indicates two officers, one on the driver's side with a gun, one on Holyfield's side without a gun. Right, but as they enter the parking lot, they have this information we talked about. They also know they are at a public place. They are dealing with a suspicion of drugs, which they know from their experience often means weapons. They know they're dealing with someone in a vehicle. They know from their experience, and as this court and other courts, including the Supreme Court, have recognized, that poses a special risk. All right, tell me about her drug history. What do we have in the record about her drug history? Was it five years ago? Was it selling? Was it using? Was it marijuana? What is there? We just know that there's some drug history. That's the extent of it. We know that he's arrested her two or three times. But when we get to the officers pulling into this parking lot, something else happens, and that is Harris gets out of her car. She gets out of the car that's ostensibly broken down for 40 minutes. She doesn't continue on her path innocently. But she doesn't get out of the car before he gets there with the gun, does she? Well, I'll read you what the record says. There's no finding by the district court on this. And I hate to belabor the facts, but the facts are very important. This is a fact-driven case, no doubt about it. On page 124 of the record, we have Epler's testimony, which is here's the question is, what did she do? Answer, as soon as we were exiting the vehicle, she ran from the vehicle. She was stopped later by uniformed guys. Wait, would you back up again? I'm sorry. 124. Okay. The attorney asked for clarification. This is the AUSA asking. The answer is, as soon as we exited our vehicle, she had ran from her vehicle, and there was uniformed guys that were also involved that they stopped her and brought her back. Then we have Detective Covington's testimony, which is at page 104. Question, you and your partners were responding, so what's happening in the parking lot at this point? You see the bag go over. Then what happened? Answer, my partner's pulled up on the driver's side of the vehicle. The female, Ms. Harris, she jumped out of the driver's side of the vehicle. She took off running to the parking lot of the Sunoco. Subsequently, she was apprehended, and he goes on on page 105 to say, Detective Ryder went to the passenger side of the vehicle. That happens whether it's the instant they're exiting their car or pulling their car in. They have to put the car into park and open the door. This has all happened simultaneously. Now they have someone who, let's say the reasonable explanation is her car's broken down. He's bringing her lunch or a spark plug. She's fleeing. She's running. We don't know why. We don't know what was in either of the pouches. We have a suspicion of drugs. We have a vehicle where this person could have access to something to defend himself. She could be running to get help for Holyfield. We don't know what's going on. We've got a public place, a gas station that's open. At this point, the passenger from Mr. Holyfield's car has entered in the convenience store, so there's other people around for the police to think, there's a lot going on here, and we need to be careful. Now, just so we're clear on this. I don't know if that's not in the record. Well, I agree. There is nothing in that record. In fact, the public place brought daylight. In fact, there are people around. It could go either way. I agree with you, but it's part of the reasonable suspicion analysis that we allow officers to make these types of decisions when they're out in the field faced with these circumstances. What do we have in the record about their reasonable suspicion? What do we have as to why they did this and why the gun was drawn? Why he came with the... He's never asked why he drew his gun. He's never asked when he drew his gun, and there's nothing on the record to indicate that Mr. Holyfield ever saw the gun. Well, we have no... Well, it says he looked around when he saw them coming and presumably had his gun drawn, but there's nothing saying he feared any danger or anything of that kind coming to him. Well, that's true, but that would be a subjective analysis. So at this point, we've got him out of the car. Now, at that point, it's reasonable for the officer to have drawn a gun. There's nothing in this record to indicate that it was ever pointed at Mr. Holyfield. He was on the passenger side of the car. He had to come out of the... You know, his car is pulled into the driver's side of Harris' car. I'm talking about Sergeant Epler's car. He's got to get out and come around. The officer who actually comes over and has contact with Mr. Holyfield is in plainclothes from a plainclothes car, or an unmarked car. He's not armed. He doesn't scream to him, you're arrested, nothing. He says, piss for the police and then gets him out of the car when he knows. He's been told by Sergeant Epler at this point, the bag contains crack cocaine. It was eminently reasonable for the officers to have used force to the extent that they did, which is only to draw a weapon. And again, when you get to the point of him coming around to the car, keep in mind that there's nothing to indicate that Mr. Holyfield ever saw this weapon, and this is what's going on with all these different things going on back and forth. Is there a limit to the seizure... the suppression request? In other words, is it limited to the drugs or the gun here? Is it as to all? I think it's as to all. And part of the defendant asking for relief? Yes. One further thing I would like to point out is with regard to the defendant's position on the timing of Ms. Harris leaving the car, page 16 of their brief at footnote 2, it stated, Detective Epler testified that Ms. Harris ran after they, quote, exited our vehicle, and thus after they blocked her car and approached with at least one weapon displayed. And they cite to page 124 of the appendix. I believe that page 124 of the appendix, as I read, does not support this construction of the facts, and there's nothing in the record to support that these things happened that quickly, that you would actually have them pulling into the lot, getting out of the car, Harris getting out of the car, and drawing a weapon such that all these things happened in one stagnant timeline. Also, with regard to the issue of whether or not And before I move to that, I would like to point out again, these events did happen quickly, so to the extent that we're under an analysis of, and we are under an analysis of, use of reasonable force, it's reasonable given how quickly all this happened. Obviously, we're disputing what happened when, but I think we would have to agree that it all happened very, very quickly, so the amount of time that he's subjected to any type of a show of force was very, very brief. To the extent that he's blocked in, I think we really... So that's what... Arrested very quickly, right? That's correct. This issue of being blocked in, the only evidence on the record is that Sergeant Efford drove his car to the driver's side of Ms. Harris' car. There's nothing in the record to show where these two marked cars were, and we have to really think about whether his movement was restricted. He's a passenger in a car that's ostensibly broken down. He's obviously not going to drive away because A, he's not the driver, and B, his story is the car's broken down. Nothing's happened to his car. But isn't the car positioned right beside the mini mart? I mean, didn't they pull up so that his passenger's side is right there at the side of the convenience store so that if someone were to pull up, he's right where the tire pump is and there's not a whole lot of... Well, there was an air pump in front of her car. I don't know what was to his side of the car. My understanding was is that there was a space in between the driver's side and where Detective Covington was. That's the way I understand the facts. I don't know what was to his right as he was sitting in the car. But the issue of whether or not he was somehow blocked, Harris got up and got out. He's got his own car. There's no evidence of that car being blocked. So I'm not sure where we get all these things arising to the level where if Harris feels free to get up and get out, Mr. Holyfield doesn't have the same expectation. Although restriction ends up being somewhat a common sense concept of whether looking at the picture as it was... Right, objectively. ...would objectively feel... Right. If there's no other questions, I'll rest on my brief. Thank you. Thank you. Again, the key point is the point of seizure. And it's a reasonable person test what a reasonable person has felt seized when three police cars block or don't block, but they're around you and one officer is approaching you with a gun and another officer is shouting, Pittsburgh Police, and three officers do get out of the car. Not all seven. What else about the escape, if you would, her flight, and what's in the record specifically about that and the timing of it? Again, we don't have any fact-finding at all about this from the trial court. We have what Ms. Irwin read, and this is Detective Epler's testimony. As soon as we exited our vehicle, she had ran from her vehicle. I mean, what does that tell us? It's bad grammar. That's about all I can tell you. But it's as soon as we exited, she had ran. I mean, how can you determine anything from that? And since there's no fact-finding, I mean, I think this is another one of those this is ambiguous. But, I mean... The district court didn't rely on that, presumably. He didn't rely on it in any shape or form. I don't think he ever mentions that aspect of the case in his opinion at all. I'd just like to point the court to my reply brief, because in the reply brief, I do go through and clarify that it is three officers getting out of the car, not all seven. I did misstate it in my issue statement at one point, but that was inadvertent. The blocking, the use of the word blocking the car, is a fair statement of the record, and I think Judge Rendell pointed out that on the right, you've got the convenience store. On the left, and to the front, is Detective Covington's car a few feet away, and then we have another detective car, the one with Epler and Wydra in it, pulling up also to the driver's side. Behind us, at undetermined angles, we have Mr. Caulfield's car and other cars, and gas pumps, and two more police cars. So the use of the word blocking is fair. But the more important point that I wanted to make in my rebuttal is, yes, officers can draw on their experience as officers, narcotics officers, to make conclusions that behavior that looks innocent to us isn't innocent, in fact. But here, none of the three testifying officers ever dotted any of those I's or crossed any of those T's. Any conclusions we have about what the officers were thinking at the time and what conclusions they drew from that innocent behavior comes entirely from the government's brief and from its oral argument, and possibly from the district court's opinion. I know at one point, the district court says, Detective Covington, Hollyfield approached the car, he sees that that's suspicious. Detective Covington never said that he thought it's suspicious to instead of approaching the driver's side and saying, hey, how you doing, or instead of going directly under the hood and looking under the hood, that that would have been reasonable. But instead, it was suspicious for him to have gone directly under the passenger's side and gotten in and chit-chatted from that point. Now, your colleague says that testimony would not help because it's an objective standard, the reasonable suspicion. But I guess it's an objective standard given what the officers who were there were perceiving. Is it objective? Is it subjective? How do we judge? An officer can make, and I'm not quite sure I understood that point, but I'll answer the question as best I can. An officer can make an inference of criminality from innocent behavior, but that would be in a situation where I saw the defendant approaching the car with a bulge in his ankle sock. And I know from my five years of being a narcotics detective that drug traffickers in this area commonly hide drugs in their ankle socks, and that's why I have reasonable suspicion. Here we don't have any of that. We don't have him saying, I know from my surveillance of this gas station for the past five years that people buying drugs pretend that they're having car trouble and put their car up and wait for 45 minutes or 40 minutes making cell phone calls waiting for their dealer to show up. We don't have any of that. We have wholly innocent behavior, innocuous behavior, and not very much of that. And we don't have anybody, any officer saying that it is in some way suspicious based on his experience. Unless there's any more questions, I'd just like to conclude by again asking that all the evidence be suppressed and it be remanded to the district court. Thank you. Thank you. The case was well argued. Thank you. Thank you.